FILED

2025 Feb-05  PM 04:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

JOEY MCKINLIN JOHNSON,      )
                                )

    Plaintiff,             )
                                )

    v.                     )   Case No. 4:24-cv-00289-NAD
                                )

SOCIAL SECURITY    ADMINISTRATION,  )
COMMISSIONER,             )
                                )

    Defendant.            )
                                )

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Joel McKinlin Johnson appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for supplemental security income (SSI) benefits. Doc. 1. Plaintiff Johnson applied for benefits with an alleged onset date of August 24, 2013. Doc. 14 at 2. The Commissioner denied Johnson's claim for benefits. Doc. 14 at 2. In this appeal, the parties consented to magistrate judge jurisdiction. Doc. 16; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUE FOR REVIEW

In this appeal, Johnson did not file a brief. Nevertheless, Johnson seeks

reversal of the finding of the Administrative Law Judge (ALJ) that Johnson was not disabled.  Doc. 1.  In particular, Johnson states that "all medical records were presented and gone over."  Doc. 1 at 3.  Johnson also appears to take issue with the timing of the filing of his Appeals Council review, stating that he "went to [the] Albertville [Social Security] office on [the] last day of filing for appeal" and he does not "know why it took 5 (five) days for the [Social Security] office to file for appeal."  Doc. 1 at 3–4.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show disability, which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505.

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for

disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

(1)    whether the claimant is engaged in substantial gainful activity;

(2)    if not, whether the claimant has a severe impairment or combination of impairments;

(3)    if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)    if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and,

(5)    if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national

economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or

substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion." *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.**     With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. And the Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th

Cir. 1991).

## BACKGROUND

### A.    Procedural background

Johnson previously filed an application for disability insurance benefits and supplemental security income on January 3, 2012.  Doc. 7-4 at 26.  An ALJ issued an unfavorable decision on that application on August 23, 2013.  Doc. 7-4 at 35.

Johnson filed an application for supplemental security income on October 24, 2018.  Doc. 14 at 2.  At the time of his application, Johnson alleged a disability onset date of August 24, 2013.  Doc. 14 at 2.

Johnson's claim was denied at the initial level on May 7, 2019.  Doc. 7-3 at 10.  Johnson then filed a written request for a hearing before an ALJ.  Doc. 7-3 at 10.  On April 6, 2022, Johnson's hearing was postponed so that he could obtain counsel.  Doc. 7-3 at 43.  On January 26, 2023, the ALJ held a hearing where Johnson appeared without counsel and waived his right to representation.  Doc. 7-3 at 49–50.  On April 19, 2023, the ALJ entered an unfavorable decision.  Doc. 7-3 at 10–21.

Johnson petitioned the Appeals Council for review, which was denied on January 3, 2024.  Doc. 7-3 at 5–6.  The Appeals Council dismissed Johnson's request for review because Johnson failed to file the request within the stated period of time.  Doc. 7-3 at 5.  Because the Appeals Council found no good cause to extend the time for filing, the ALJ's decision became the final decision of the Commissioner.  Doc.

7-3 at 6; *see* 42 U.S.C. § 405(g).

**B.    Factual background, and ALJ hearing**

Johnson was born on April 22, 1971.  Doc. 7-4 at 2.

On December 9, 2009, Johnson visited Sardis City Medical Center for depression/anxiety, chronic low back pain, and headaches due to a motor vehicle accident.  Doc. 7-10 at 4.

On August 23, 2010, September 13, 2010, and February 17, 2011, Johnson visited a clinic with Quality of Life Health Services, Inc. for abscesses, anxiety, cellulitis, and sores in his mouth.  Doc. 7-10 at 8–20.

On January 3, 2012, Johnson presented to a clinic with Quality of Life Health Services, Inc. with lower back pain, including spasms and tenderness.  Doc. 7-10 at 21.  Johnson was given a Toradol injection.  Doc. 7-10 at 25.

On February 1, 2012, Johnson attended a follow-up appointment at a clinic with Quality of Life Health Services, Inc. to review MRI results, which showed "mild disc bulge in 2 levels."  Doc. 7-10 at 26.

On March 6, 2012, Johnson visited a clinic with Quality of Life Health Services, Inc. for high blood pressure.  Doc. 7-10 at 33.

On July 24, 2012, Johnson visited Sardis City Medical Center for bilateral knee pain and urinary symptoms.  Doc. 7-10 at 37. Johnson's physical exam showed a normal range of motion, muscle strength, and stability in Johnson's

musculoskeletal system.  Doc. 7-10 at 39.

On August 27, 2012, Johnson visited Sardis City Medical Center with back pain and bilateral knee pain.  Doc. 7-10 at 41.  A physical exam of Johnson's musculoskeletal system showed normal range of motion, muscle strength, and stability in all extremities with no pain on inspection.  Doc. 7-10 at 43.

On August 30, 2012, Johnson visited Sardis City Medical Center for back pain.  Doc. 7-10 at 45.  Johnson was referred for an MRI.  Doc. 7-10 at 48.

On October 23, 2012, Johnson visited Sardis City Medical Center for back pain, cellulitis, and headache.  Doc. 7-10 at 49.  A physical exam showed tenderness in Johnson's lumbar spine.  Doc. 7-10 at 51.

On February 6, 2014, Johnson visited Sardis City Medical Center for back pain and anxiety.  Doc. 7-10 at 53.  A physical examination of Johnson's musculoskeletal system showed a normal range of motion, muscle strength, and stability in all extremities with no pain on inspection.  Doc. 7-10 at 55.

On March 5, 2014, Johnson presented to Sardis City Medical Center for back pain and a referral to pain management.  Doc. 7-10 at 57.  A physical exam of Johnson's musculoskeletal system showed tenderness in the lumbar spine and moderate pain with motion.  Doc. 7-10 at 59.  Johnson was referred to a pain clinic.  Doc. 7-10 at 60.

On June 24, 2014, Johnson presented to Sardis City Medical Center with back

pain.  Doc. 7-10 at 61.  Johnson again was referred to a pain clinic.  Doc. 7-10 at 64.

On August 15, 2014, Johnson visited a clinic with Quality of Life Health Services, Inc. for medication refills.  Doc. 7-10 at 65.  Intake comments show that Johnson established care with Tennessee Valley Pain Management.  Doc. 7-10 at 65.

On September 19, 2014, Johnson visited a clinic with Quality of Life Health Services, Inc. for back pain.  Doc. 7-10 at 78.  Additional information shows that Johnson was scheduled for an epidural injection with Tennessee Valley Pain Management the following month.  Doc. 7-10 at 78.

On September 30, 2014, Johnson visited a clinic with Quality of Life Health Services, Inc. for headaches.  Doc. 7-10 at 85.  Johnson was provided medication. Doc. 7-10 at 88.

On October 9, 2014, Johnson visited a clinic with Quality of Life Health Services, Inc. for back pain.  Doc. 7-10 at 92.  Johnson requested a Toradol shot. Doc. 7-10 at 92.

On July 1, 2015, Johnson visited a clinic with Quality of Life Health Services, Inc. for lower back pain.  Doc. 7-10 at 99.  Johnson reported that his symptoms were aggravated by lifting, pushing, and walking, but that his symptoms were relieved by pain medication.  Doc. 7-10 at 99.

On March 11, 2016, Johnson visited a clinic with Quality of Life Health

Services, Inc. for headaches.  Doc. 7-10 at 106.  Johnson rated his pain as a 7 out of 10.  Doc. 7-10 at 106.  Johnson was prescribed medication.  Doc. 7-10 at 109.

On April 7, 2016, Johnson visited a clinic with Quality of Life Health Services, Inc. for headaches.  Doc. 7-10 at 113.  Johnson rated his pain as a 10 out of 10.  Doc. 7-10 at 113.  Johnson also reported back pain and requested referral to a neurologist.  Doc. 7-10 at 113.

On May 13, 2016, Johnson visited a clinic with Quality of Life Health Services, Inc. for severe hip pain.  Doc. 7-10 at 120.  Johnson was referred to diagnostics for hip x-rays, to a neurologist, and to Huntsville Pain Clinic.  Doc. 7-10 at 124.

On August 23, 2016, Johnson presented to a clinic with Quality of Life Health Services, Inc. with worsening lower back pain.  Doc. 7-10 at 128.  A physical exam showed muscle spasms in the lumbar spine with moderate pain with motion.  Doc. 7-10 at 132.

On September 7, 2016, Johson presented to a clinic with Quality of Life Health Services, Inc. for worsening lower back pain.  Doc. 7-10 at 134.  Johnson was instructed to apply moist heat, avoid bending, and to take medication as directed. Doc. 7-10 at 139.

On November 10, 2016, Johnson presented to a clinic with Quality of Life Health Services, Inc. with moderate lower back pain.  Doc. 7-10 at 141.  Johnson

was instructed to apply moist heat, avoid bending, and to take medication as directed. Doc. 7-10 at 145.

On April 19, 2017, Johnson presented to a clinic with Quality of Life Health Services, Inc. with back pain and peripheral neuropathy. Doc. 7-10 at 147. Johnson was referred to orthopedic surgery. Doc. 7-10 at 152.

On October 16, 2017, Johnson presented to a clinic with Quality of Life Health Services, Inc. for moderate to severe back pain. Doc. 7-10 at 156. Johnson also completed a questionnaire indicating moderately severe depression. Doc. 7-10 at 157. Johnson was instructed to apply moist heat, avoid bending, and take medication as directed. Doc. 7-10 at 161. Johnson also was instructed to see a counselor. Doc. 7-10 at 162.

On November 29, 2018, Johnson attended an office visit with Tennessee Valley Pain Consultants. Doc. 7-10 at 214. Johnson reported constant lower back and neck pain. Doc. 7-10 at 215. Johnson was instructed to continue therapeutic home exercise program. Doc. 7-10 at 220.

An MRI from Marshall Medical Center South on January 6, 2012, showed mild annular bulging at L2/L3 and L3/L4, but the study was otherwise unremarkable. Doc. 7-10 at 169.

A diagnostic imaging report from Marshall Medical Center South of an x-ray of Johnson's knees on July 30, 2012, showed no fracture or dislocation. Doc. 7-10

at 168. The articular relationships were intact, and the regional soft tissues were unremarkable. Doc. 7-10 at 168.

A diagnostic imaging report from Marshall Medical Center South of an MRI of Johnson's lumbar spine on September 11, 2012, showed mild narrowing of the L2/L3 disc space and mild desiccation of the disc. Doc. 7-10 at 166. The report found that there had been no significant change when compared to an MRI from January 6, 2012. Doc. 7-10 at 166.

A diagnostic imaging report from Marshall Medical Center South of a CT scan of Johnson's brain on April 19, 2017, showed no acute intracranial abnormality. Doc. 7-10 at 165; Doc. 7-11 at 9.

A diagnostic imaging report from Marshall Medical Center South of x-rays of Johnson's knees on February 21, 2018, showed no fracture or dislocation, and the joint spaces and soft tissues were unremarkable. Doc. 7-11 at 7.

On December 5, 2018, Johnson completed a comprehensive psychological evaluation with Barry S. Wood, Ph.D. Doc. 7-11 at 29. Dr. Wood's diagnoses included delusional disorder, amphetamine-type substance use disorder in early remission, cannabis use disorder in sustained remission, and alcohol use disorder in sustained remission. Doc. 7-11 at 30. Dr. Wood opined that he did not believe Johnson was "capable of functioning adequately in a standard workplace as a result of his psychiatric condition." Doc. 7-11 at 30. Dr. Wood also opined that Johnson

"is not able to tolerate environmental stressors to which he would inevitably be exposed in a standard workplace."  Doc. 7-11 at 30.

On February 5, 2019, Johnson underwent a Social Security disability examination with Dr. Larry Johnston.  Doc. 7-11 at 16.  Dr. Johnston's physical examination of Johnson and diagnoses showed that Johnson was positive for chronic low back pain, chronic neck pain, bilateral knee osteoarthritis, chronic headaches, and neuropathy of the bilateral upper and lower extremities.  Doc. 7-11 at 18.  Dr. Johnston found that Johnson would have difficulty lifting and bending and would likely miss work frequently due to headaches.  Doc. 7-11 at 20.  Dr. Johnson also found that Johnson could walk normally, and had no impairment in his ability to sit or stand.  Doc. 7-11 at 20.

On April 17, 2019, Johnson was evaluated by Jack L. Bentley, Jr., Ph.D. for a mental examination.  Doc. 7-11 at 25.  Dr. Bentley's diagnostic impression of Johnson showed mild depressive disorder with anxiety due to medical reasons, polysubstance abuse in remission, episodic alcohol abuse in remission, and chronic pain disorder.  Doc. 7-11 at 26.  Dr. Bentley opined that Johnson "would have moderate limitations in his ability to sustain complex or repetitive work-related activities" and that there are "mild deficits in his ability to sustain more simple work related activities if so motivated."  Doc. 7-11 at 27.  Dr. Bentley also opined that Johnson "would certainly seem capable of communicating effectively with

13

coworkers and supervisors if so motivated." Doc. 7-11 at 27.

On May 7, 2019, in Johnson's disability determination explanation at the initial level, Dr. Robert Estock found that Johnson's medically determinable impairments "are not expected to produce the severity of the stated symptoms and functional limitations are partially consistent with the objective findings from the objective medical evidence in [the] file." Doc. 15 at 43. Dr. Estock opined that Johnson has limitations with understanding and memory. Doc. 7-4 at 18.

On February 8, 2019, Dr. Krishna Reddy opined that Johnson could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand and/or walk for 6 hours per workday, sit for about 6 hours per workday, push and/or pull for an unlimited amount of time, frequently climb ramps, never climb ladders, frequently balance, frequently stoop, frequently kneel, frequently crouch, and frequently crawl. Doc. 7-4 at 16–17.

On July 8, 2022, Johnson presented to Rapid Care Family Medical Clinic with a complaint of lower back pain. Doc. 7-11 at 49. Johnson rated his pain as a 10 out of 10. Doc. 7-11 at 49. Johnson was instructed to apply moist heat and take ibuprofen for pain. Doc. 7-11 at 51.

On July 28, 2022, Johnson presented to Rapid Care Family Medical Clinic for a follow-up visit about his ongoing neck and lower back pain. Doc. 7-11 at 45. Johnson was referred for an MRI. Doc. 7-11 at 48.

On November 1, 2022, Johnson presented to Rapid Care Family Medical Clinic for a follow-up after an MRI. Doc. 7-11 at 37. Johnson's "C-spine MRI showed mild degenerative changes" and his "lumbosacral MRI showed mild broad-based bulging at T11-T12, mild broad-based bulging of the disc at L2-L3 with bilateral mild impingement of the nerve roots, moderate broad-based bulging at L3-L4 with some mild central spinal stenosis." Doc. 7-11 at 37. Johnson's "L4-L5 showed mild broad-based bulging with bilateral impingement of the exiting nerve roots." Doc. 7-11 at 37.

On January 26, 2023, the ALJ held an in-person hearing on Johnson's application for benefits. Doc. 7-3 at 49. At the hearing, Johnson testified that he lives in a "little popup camper" on a chicken farm. Doc. 7-3 at 54. Johnson testified that he does not drive. Doc. 7-3 at 54. Johnson testified that in his previous jobs he handled inventory for a restaurant and cooked and cleaned at a group home. Doc. 7-3 at 54–56.

Johnson testified that because of injuries to his back he can "hardly lift anything." Doc. 7-3 at 56. Johnson testified that it is difficult for him to bend over and to sit down and that he has trouble tying his shoes and dressing himself. Doc. 7-3 at 56. Johnson testified that, in addition to his back condition, he has a mental health condition that affects his ability to work. Doc. 7-3 at 57.

Johnson testified that he has acute osteoarthritis and degenerative bone

disease in his spine.  Doc. 7-3 at 57.  Johnson testified that in August 1990 he sustained a "massive frontal head lobe injury" from a motor vehicle accident.  Doc. 7-3 at 57–58.

Johnson testified that he could walk "maybe five minutes" before his legs and feet "start going numb and hurting."  Doc. 7-3 at 58–59.  Johnson also testified that he could sit but has to "move continuously to try and get comfortable."  Doc. 7-3 at 59.

Vocational Expert (VE) Mary Pierce testified that a hypothetical individual with Johnson's age, education, work experience, and the limitations posed by the ALJ could perform jobs that exist in significant numbers in the national economy.  Doc. 7-3 at 61–66.

### C.    ALJ decision

On April 19, 2023, the ALJ entered an unfavorable decision.  Doc. 7-3 at 10–21.  The ALJ found that Johnson "has not been under a disability, as defined by the Social Security Act, since October 24, 2018, the date the application was filed."  Doc. 7-3 at 11, 21.

The ALJ applied the five-part sequential test for disability.  Doc. 7-3 at 12–16; *see* 20 C.F.R. § 416.920(a).  The ALJ found that, while Johnson worked after his application date, his work activity did not rise to the level of substantial gainful activity.  Doc. 7-3 at 12.  The ALJ found that Johnson had severe impairments of

degenerative disc disease, anxiety disorder, depressive disorder, adjustment disorder, and panic disorder. Doc. 7-3 at 13. The ALJ also found that Johnson had non-severe impairments of delusional disorder, osteoarthritis of the knees, headaches, neuropathy, substance use disorder, and alcohol use disorder. Doc. 7-3 at 13.

The ALJ found that Johnson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations. Doc. 7-3 at 14.

The ALJ then determined Johnson's residual functional capacity (RFC), finding that Johnson could "perform light work" as defined in the regulations, except that he can only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; can never climb ladders, ropes, or scaffolds; and can never be exposed to high, exposed places or moving, mechanical parts. Doc. 7-3 at 16. The ALJ found that Johnson can understand, remember, and carry out simple instructions and make simple work related decisions and that he can work at a consistent pace throughout the workday but "cannot perform specific production rate pace work such as assembly line work or work requiring hourly quotas." Doc. 7-3 at 16. The ALJ found that Johnson can tolerate occasional interaction with coworkers, supervisors, and the public, and he can tolerate occasional changes in the work setting. Doc. 7-3 at 16.

In assessing Johnson's RFC and the extent to which his symptoms limited his function, the ALJ stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work related activities."  Doc. 7-3 at 16.  The ALJ also stated that, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ "must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities."  Doc. 7-3 at 16.

The ALJ found that Johnson's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Johnson's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  Doc. 7-3 at 17.

The ALJ then summarized the evidence underlying the ALJ's decision, finding that Johnson has a long history of degenerative disc disease and chronic low back pain since at least 2009.  Doc. 7-3 at 17.  The ALJ found that Johnson was prescribed pain medication, Toradol shots, and lumbar epidural steroid injections,

but Johnson "did not participate in any care for his back or any other impairment from 2018 through late 2022." Doc. 7-3 at 17.

The ALJ summarized Johnson's examination with Dr. Larry Johnston, where Johnson complained of low back pain, and reported that while his pain was a 7 out of 10 Johnson could complete his activities of daily living with medication. Doc. 7-3 at 17. The ALJ found that at that examination Johnson "had mild tenderness . . . and paraspinal spasm but had full strength and sensation in all extremities." Doc. 7-3 at 17. The ALJ summarized Dr. Johnston's opinion that Johnson "would have difficulty with lifting due to his back pain but would have no difficulty with walking, sitting or standing." Doc. 7-3 at 17. The ALJ found Dr. Johnston's opinion "unpersuasive as the limitations for lifting and bending are not clearly defined." Doc. 7-3 at 19.

The ALJ summarized a July 2022 appointment where Johnson re-established care with a physician for back and neck pain. Doc. 7-3 at 17. The ALJ found that imaging showed "multilevel degenerative changes with mild building at L2-3 with bilateral mild impingement of the nerve roots, moderate building at L3-4 with . . . central spinal stenosis, mild bulging at L4-5 with bilateral impingement on the exiting nerve roots, and mild bulging at L5-S1." Doc. 7-3 at 17. The ALJ found that Johnson's physician recommended heat and ibuprofen as needed and that Johnson "has not had additional follow up or had any surgical or neurological

consults." Doc. 7-3 at 17–18.

The ALJ also considered Johnson's mental impairments of depressive disorder, adjustment disorder, anxiety disorder, and panic disorder. Doc. 7-3 at 18. The ALJ found that Johnson was examined by Dr. Barry Wood in 2018, but instead of providing records Dr. Wood provided a letter with his diagnoses. Doc. 7-3 at 18. The ALJ found that in the letter Dr. Wood opined that Johnson "was not capable of functioning adequately in a standard workplace and that his ability to interact with coworkers, supervisors, and customers would be too impaired by his thought disorder." Doc. 7-3 at 18. The ALJ found that "Dr. Wood[] further noted [that Johnson] could not tolerate environmental stressors to which he would inevitably be exposed to in a standard workplace, though Dr. Wood[] did not provide the basis for these opinions." Doc. 7-3 at 18. The ALJ found Dr. Wood's opinion "not persuasive," as "it is not supported by or consistent with the overall medical findings." Doc. 7-3 at 19. The ALJ also found that "Dr. Wood[] did not include his own findings or examination notes with his opinion and it is unclear whether Dr. Wood[] had [Johnson's] longitudinal history or any records to examine prior to forming his opinion." Doc. 7-3 at 19.

The ALJ summarized the findings of Dr. Jack Bentley, Jr. from April 2019, where Johnson "endorsed evidence of moderate to severe depression, crying spells, panic attacks, and social withdrawal." Doc. 7-3 at 18. The ALJ found that Dr.

Bentley diagnosed Johnson with depressive disorder with anxiety and chronic pain disorder and that Dr. Bentley opined that Johnson would have "moderate limitations in the ability to sustain complex or repetitive work-related activities and mild deficits in the ability to sustain simple work-related activities." Doc. 7-3 at 18. The ALJ found Dr. Bentley's opinion "to be somewhat persuasive." Doc. 7-3 at 19.

The ALJ also considered the opinions of Dr. Krishna Reddy and Dr. Robert Estock. Doc. 7-3 at 19. The ALJ found that the opinion of Dr. Reddy, the state agency medical consultant, was "less persuasive" because the "recent imaging received at the hearing level supports a finding the claimant is limited to light exertional work." Doc. 7-3 at 19. The ALJ also found that Dr. Estock's opinion was persuasive "to the extent it is consistent with the residual functional capacity but . . . where Dr. Estock used non-vocationally relevant terms, that language has not been considered." Doc. 7-3 at 19.

The ALJ then found that Johnson is "independent in his personal care and hygiene, can drive a car but does not have one, can fix simple meals, and does some household chores like laundry and light cleaning." Doc. 7-3 at 18. The ALJ also found that Johnson "lives alone in a camper on someone else's property and goes grocery shopping as needed." Doc. 7-3 at 18. The ALJ found that Johnson "has described activities that are consistent with a reduced range of light exertional work." Doc. 7-3 at 18.

The ALJ then found that Johnson is unable to perform any past relevant work. Doc. 7-3 at 19.

After considering Johnson's age, education, work experience, RFC, and the testimony of the VE, the ALJ found that Johnson could perform jobs that exist in significant numbers in the national economy. Doc. 7-3 at 21.

## DISCUSSION

As an initial matter (and as noted above), Johnson has not filed a brief. By not filing a brief, Johnson has waived all arguments on appeal. In general, when a party does not elaborate on a claim or provide citation to supporting authority the party abandons the claim. *See, e.g.*, *Outlaw v. Barnhart*, 197 F. App'x 825, 828 n.3 (11th Cir. 2006) (*citing Cheffer v. Reno*, 55 F.3d 1517, 1519 n.1 (11th Cir. 1995)); *Zuba-Ingram v. Commissioner of Soc. Sec.*, 600 F. App'x 650, 656 (11th Cir. 2015); *Wright v. Kijakazi*, No. 4:20-cv-455-GMB, 2021 WL 4315800, at *3–4 (N.D. Ala. Sept. 22, 2021). In this case, Johnson did not file a brief at all. Accordingly, Johnson has abandoned all arguments.

Johnson's complaint appears only to challenge the timing of the filing of his appeal to the Appeals Council and the Appeals Council's decision to deny Johnson an extension of time. Doc. 1 at 3–4. "When reviewing Appeals Council dismissals, the Court may only consider whether the Appeals Council's refusal to grant an extension of time was an abuse of discretion." *Griffin v. United States Soc. Sec.*

*Admin.*, No. 7:17-cv-01818-LSC, 2018 WL 2197553 at *3 (N.D. Ala. May 14, 2018).  "No abuse of discretion exists unless the Appeals Council has acted 'arbitrarily or unreasonably,' such as by failing to consider relevant factors or by committing a clear error of judgment."  *Id.*

Johnson alleges that he went to the Albertville Social Security office on the "last day of filing for appeal" and does not know "why it took 5 (five) days for the [Social Security] office to file for appeal."  Doc. 1 at 4.  The order from the Appeals Council states that Johnson alleged that he never received the ALJ's decision in the mail and "had to go to the local Social Security Administration office in person for a copy of the [ALJ's] decision."  Doc. 7-3 at 5; *see* Doc. 7-3 at 29.  The order states that Johnson alleged that "he does not have a vehicle and lives 22 miles from the . . . local office."  Doc. 7-3 at 5; *see* Doc. 7-3 at 29.  The order also states that Johnson alleged that "he spoke with a man who said that he would make a note of [Johnson's] efforts and would file the appeal for the claimant."  Doc. 7-3 at 5; *see* Doc. 7-3 at 29.

But the Appeals Council determined that there was no report of Johnson's contact with the local office in the electronic folder, and that "there is no evidence of any errors when the decision was printed and mailed," as "the United States Postal Service did not return the mailed decision as undeliverable, and [Johnson's] address is unchanged."  Doc. 7-3 at 5.  Further, the Appeals Council found that, while

Johnson stated that he lives 22 miles from the local office (*see* Doc. 7-3 at 29), Johnson's address is "located approximately four miles" from the local office. Doc. 7-3 at 6. Thus, the Appeals Council found no good cause to extend the time for filing and dismissed Johnson's request for review. Doc. 7-3 at 6.

Extensions of time to request Appeals Council review must be filed in writing within the stated time period. 20 C.F.R. § 416.1468. To receive an extension, a claimant must show good cause for missing the deadline. *Id*. The Appeals Council considers the factors and examples in 20 C.F.R. § 416.1411 to determine whether a claimant has shown good cause. While not receiving notice of the initial determination or decision is provided as an example of a circumstance where there may be good cause (*see* 20 C.F.R. § 416.1411(7)), the Appeals Council properly determined that there is no record evidence that there were any errors made in mailing—notwithstanding Johnson's allegation that he never received the ALJ's decision.

In addition, based on the record evidence, the Appeals Council was unable to corroborate Johnson's alleged conversation with someone at his local Social Security Office, and the Appeals Council was able to disprove Johnson's statements about the distance between the local office and his home address. And, while Johnson does have mental health conditions and states in his complaint that he has a "DSM5 mental disorder" (*see* Doc. 1 at 4), there is no indication or record evidence

that Johnson did not understand the filing deadline. Accordingly, the Appeals Council did not abuse its discretion in finding that Johnson had not shown good cause for missing the deadline for review.

Moreover, substantial evidence supports the Commissioner's decision, and Johnson agrees that "[a]ll medical records were presented and gone over." Doc. 1 at 3. The ALJ's opinion demonstrates that the ALJ considered Johnson's medical records, hearing testimony, and prior administrative medical findings in arriving at the conclusion that Johnson had not been under a disability, as defined in the Social Security Act, since October 24, 2018. The ALJ correctly applied the five-step evaluation process, first finding that Johnson had not engaged in substantial gainful activity since his application date of October 24, 2018. Doc. 7-3 at 12.

The ALJ then found that Johnson had the severe impairments of degenerative disc disease, anxiety disorder, depressive disorder, adjustment disorder, and panic disorder. Doc. 7-3 at 13. The ALJ stated that the ALJ "must consider the claimant's subjective allegations" when assessing Johnson's medically determinable impairments and their impact on his ability to perform work functions.

The ALJ found that Johnson had the non-severe impairments of delusional disorder, osteoarthritis of the knees, headaches, neuropathy, substance use disorder, and alcohol use disorder. Doc. 7-3 at 13. The ALJ also found that, because Johnson has not sought specialized treatment for his headaches and does not take any

medication to prevent or treat his headaches, the headaches are a non-severe impairment. Doc. 7-3 at 13. The ALJ found that Johnson's knee pain was non-severe, stating that Johnson "had full range of motion in both knees on examination," "has not had any further imaging," and "does not take any medication for this impairment." Doc. 7-3 at 13. The ALJ also found that Johnson's neuropathy was a non-severe impairment because Johnson does not take medication for his neuropathy and "had normal sensation in all extremities and was intact to light touch." Doc. 7-3 at 13. The ALJ found that Johnson's delusional disorder was non-severe because only Dr. Wood, who did not provide evaluation notes or a report, diagnosed Johnson with delusional order, and Johnson has not sought mental health treatment since the alleged onset date. Doc. 7-3 at 14. And, because Johnson testified that he has not used any illegal substances or alcohol for many years, the ALJ found Johnson's alcohol use disorder and substance use disorder to be non-severe impairments. Doc. 7-3 at 14.

In determining that Johnson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in the applicable regulations, the ALJ reviewed the record and found that "the evidence of record does not contain any diagnostic findings, signs, symptoms, or laboratory results that meet any of the listed impairments." Doc. 7-3 at 14. The ALJ also found that "there are no opinions in the record from medical

experts or any other type of medical or psychological consultants designated by the Commissioner, which indicated that [Johnson's] impairments alone or in combination equal a listing." Doc. 7-3 at 14.

The ALJ then correctly followed the evaluation process in determining Johnson's RFC to perform light work with limitations. Doc. 7-3 at 16. The ALJ's opinion discusses Johnson's long history of degenerative disc disease and chronic low back pain but finds that Johnson "did not participate in any care for his back or any other impairment from 2018 through late 2022." Doc. 7-3 at 17. The ALJ also found that, after re-establishing care with a physician for back and neck pain in July 2022, Johnson "has not had additional follow up or had any surgical or neurological consults." Doc. 7-3 at 17–18. The ALJ found that, because Johnson "has positive imaging relating to his degenerative disc disease but has not had surgery recommended," Johnson "is appropriately limited to light work with occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling." Doc. 7-3 at 18.

In finding Johnson's RFC, the ALJ also considered Johnson's mental impairments of depressive disorder, adjustment disorder, anxiety disorder, and panic disorder. Doc. 7-3 at 18.

The ALJ also properly considered the evidence that Johnson "is independent in his personal care and hygiene, can drive a car but does not have one, can fix simple

meals, and does some household chores like laundry and light cleaning."  Doc. 7-3 at 18.

Generally speaking, when considering medical opinions, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."  *Winschel*, 631 F.3d at 1179.  Here, the ALJ found that Dr. Reddy's opinion was "less persuasive" because "the recent imaging received at the hearing level supports a finding the claimant is limited to light exertional work."  Doc. 7-3 at 19.  The ALJ also found Dr. Estock's opinion "to be persuasive to the extent it is consistent with the residual functional capacity," but did not consider language "where Dr. Estock used non-vocationally relevant terms."  Doc. 7-3 at 19.  The ALJ found Dr. Wood's evaluation "to be not persuasive" because "it is not supported or consistent with the overall medical findings," "did not include [Dr. Wood's] own findings or examination notes," and it was unclear whether Dr. Wood had any of Johnson's prior history or records to examine when forming his opinion.  Doc. 7-3 at 19.  As to Dr. Bentley, the ALJ found his opinion "to be somewhat persuasive," but the ALJ "added additional social limitations based on the treating records and . . . testimony."  Doc. 7-3 at 19.  The ALJ also considered Dr. Johnston's opinion and found it to be "unpersuasive as the limitations for lifting and bending are not clearly defined" and because "the opinion regarding missed days for chronic headaches is not supported by the doctor's examination or the overall medical

evidence of record." Doc. 7-3 at 19. Accordingly, the ALJ properly weighed and explained the weight given to the medical opinions when finding Johnson's RFC.

Thus, the ALJ's decision was "supported by substantial evidence and based upon proper legal standards." *See Lewis*, 125 F.3d at 1439. The court cannot reweigh the evidence. *Winschel*, 631 F.3d at 1178. And, where the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C § 405(g)), the Commissioner's decision is **AFFIRMED**. The court separately will enter final judgment.

**DONE** and **ORDERED** this February 5, 2025.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE